J-S67027-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| LLOYD A. DECKER | |
| Appellant | No. 621 WDA 2014 |

Appeal from the Judgment of Sentence April 11, 2013
In the Court of Common Pleas of Crawford County
Criminal Division at No(s): CP-20-CR-0000973-2011

BEFORE: DONOHUE, J., MUNDY, J., and FITZGERALD, J.[*]

MEMORANDUM BY MUNDY, J.:                    **FILED JANUARY 08, 2015**

Appellant, Lloyd A. Decker, appeals *nunc pro tunc* from the April 11, 2013[1] aggregate judgment of sentence of four to eight years' incarceration after the trial court granted his post-sentence motions and imposed a new sentence on three counts of theft by deception, one count of theft by failure

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant purports to appeal from the December 10, 2012 judgment of sentence. The trial court, however, granted Appellant's post-sentence motions and modified Appellant's sentence on April 11, 2013. Therefore, Appellant is properly appealing from the April 11, 2013 judgment of sentence. We have corrected our caption accordingly.

to make required disposition of funds, and two counts of securing execution of documents by deception.[2]  After careful review, we affirm.

The trial court summarized the relevant facts of this case as follows.

> [Appellant] is purportedly a developer who sold lots to David and Jennifer Spahn (the "Spahns") and to Steven and Deborah Stegman (the "Stegmans"), and contracted to sell lots to Thomas D. Kelly ("Kelly"). …  [The details of the transactions relating to each purchaser are as follows.]
>
> **Spahns:**  Responding to [Appellant's] Internet advertisement for the sale of lots along French Creek in Crawford County, Mr. Spahn arranged to meet with [Appellant] at the site in early 2010.  They verbally agreed that [Appellant] would have some trees removed, the land leveled, and a water well installed.  Mr. Spahn was assured that the electric service would be available and, while the Spahns initially did not need them, sewage facilities would not be a concern because of the property's remote location in East Fairfield Township.  The purchase price was set at $15,000.  Closing was held sometime between January 19 and February 1, 2010, prior to which some tree removal and grading had been done.  A well was subsequently completed.
>
> The local sewage enforcement officer (the "SEO"), after inspecting the Spahns' land on April 14, 2010, informed [Appellant] that the soils would not pass a perk test, i.e., were unsuitable for any type of in-ground septic system eligible for a permit. [Appellant] never disclosed the SEO's report to the Spahns, nor did he offer to rescind the purchase and sale transaction.
>
> By check dated May 27, 2010, [Appellant] was paid $1,850 for electric service, which was never

_____

[2] 18 Pa.C.S.A. §§ 3922, 3927, and 4144, respectively.

provided. In the following months, [Appellant] twice contacted Mr. Spahn and succeeded in interesting him in the purchase of a pre-fabricated log cabin to be built on the purchased lots. They met on August 5, 2010, and [Appellant] was paid $500 cash and $3,000 by check, with the balance of the $7,500 purchase price paid by check dated August 13, 2010. All checks were immediately cashed. [Appellant] verbally contracted with Benjamin Byler ("Byler") for the installation of the cabin. No building permit was ever sought, for which a sewage permit would have been a prerequisite.

Byler substantially completed the portable cabin, though at a height [Appellant] had specified of about thirty inches above ground in violation of zoning regulations; a minimum of eight and a half feet was required because the property lay in a flood zone. When the only payments Byler received from [Appellant] were two checks, both of which bounced, he removed the cabin. The Spahns were never refunded any of the money they paid [Appellant] for either the cabin or electric service, and their telephone calls to him went unreturned.

**Stegmans:** Also responding to [Appellant's] Internet advertisements, Mr. Stegman met with him on April 14, 2010 and discussed plans to build a cabin on lots adjoining the Spahn property. They executed a sales agreement ten days later, setting the purchase price at $30,000 and appending a list of improvements consisting of tree removal, leveling, planting grass, and adding driveways and utilities, with completion being "weather dependent." The specified utilities included "$H_2O$, electric, and spring water holding tank (1000 gal)." Closing was held on May 15, 2010, and prior or subsequent thereto[,] the property was leveled, grass planted, identified trees cut down, graveled driveway added, and a sixty foot well dug.

Electrical service was never established, nor was a permitted sewage system ever installed. [Appellant] knew from the SEO's April 14, 2010

- 3 -

report, which had evaluated the Stegman as well as the Spahn lots, that an in-ground sewage system was impermissible. He nevertheless later informed Mr. Stegman that a stake indicated the location of the spring water holding tank, without disclosing that such a tank did not constitute an allowable septic system.

**Kelly:** After also viewing an Internet advertisement posted by [Appellant], Mr. Kelly met with him on May 6, 2010 to evaluate the offered real estate along French Creek as a site for a weekend getaway cottage. [Appellant] suggested a fresh water holding tank as an adequate sewer system, which Kelly refused. They that day signed an Agreement of Sale expressly contingent upon approval for a sewer system costing no more than fifteen thousand dollars.

The property was owned by W. L. Dunn Construction Company ("W. L. Dunn"), from whom [Appellant] represented that he would receive, as developer, thirty percent of the $61,500 purchase price. He verbally agreed to construct a road, clear land for the dwelling, drill a well, bring in electricity, and install a septic system. Kelly made a down payment of $6,200, and between May 29 and October 11, 2010, paid [Appellant] an additional $23,750 with [Appellant] signing receipts for $8,200 that referenced a septic survey and septic materials.

No sewage permit was ever issued, although soils there were determined to be suitable for an in-ground septic system. The only development that occurred on the property was some clearing and bulldozing for a roadway. W. L. Dunn received none of the sums paid by Kelly, and Kelly received neither a deed to the property nor any refund. [Appellant] avoided all of Kelly's later attempts to contact him.

Trial Court Memorandum and Order, 4/11/13, at 1-4 (footnotes omitted).

On November 23, 2011, the Commonwealth filed a nine-count criminal complaint charging Appellant with three counts of theft by deception, two counts of theft by failure to make required disposition of funds, three counts of securing execution of documents by deception, and one count of deceptive business practices. Appellant was arrested on December 1, 2011. On August 20, 2012, following a non-jury trial, Appellant was found guilty of three counts of theft by deception, one count of theft by failure to make required disposition of funds, and three counts of securing execution of documents by deception. Appellant was found not guilty of the two remaining counts of theft by failure to make required disposition of funds and deceptive business practices. On December 10, 2012, the trial court imposed an aggregate sentence of four to eight years' incarceration as well as a total of $2,600.00 in fines and $74,350.00 in restitution.[3] Trial Court Sentence Order, 12/10/12, at 1-2.[4]

_____

[3] The trial court imposed consecutive terms of one to two years' incarceration and a fine of $500.00 on each of the three theft by deception counts, for an aggregated three to six years' incarceration and a $1,500.00 fine. On the count of theft by failure to make required disposition of funds, the trial court imposed a $500.00 fine and one to two years' incarceration consecutive to the convictions for the three counts of theft by deception. On each securing execution of documents by deception count, the trial court imposed a $200.00 fine and a term of three months to two years' incarceration concurrent with the sentence for theft by failure to make required disposition of funds, but consecutive to the sentences for theft by deception. Thus the aggregate sentence was four to eight years' incarceration plus $2,600.00 in fines. The trial court also ordered restitution
*(Footnote Continued Next Page)*

On December 20, 2012, Appellant filed a post-sentence motion. On April 11, 2013, the trial court, granted the motion in part, acquitting Appellant of the charge of securing execution of documents by deception regarding the Stegmans, and reducing the amount of restitution awarded to the Spahns. Trial Court Memorandum and Order, 4/11/13, at 1-2. The trial court denied Appellant's remaining requests for relief. The April 11, 2013 order modified Appellant's sentence accordingly.[5] *Id.* at 15-16.

Thereafter, Appellant timely filed a notice of appeal on May 2, 2013. On October 22, 2013, this Court dismissed the appeal for Appellant's failure to file a brief. Superior Court Order, 10/22/13, at 1.

On December 9, 2013, Appellant filed *pro se* a PCRA petition. The trial court appointed counsel, and counsel filed an amended PCRA petition on

*(Footnote Continued)* —————————

in the amount of $29,950.00 to Kelly; $19,350.00 to the Spahns; and $25,500.00 to Steven Stegman.

[4] The trial court's sentencing order is not paginated. For ease of reference, we have numbered the pages of the sentence order sequentially.

[5] The trial court did not modify its sentence on the three counts of theft by deception, the one count of theft by failure to make required disposition of funds, or two of the counts of securing execution of documents by deception. The trial court vacated Appellant's conviction for securing execution of documents by deception, with respect to Steven Stegman, and therefore eliminated that portion of Appellant's sentence for an aggregate sentence of four to eight years' incarceration, plus $2,400.00 in fines. The trial court also modified the award of restitution to $29,950.00 to Kelly, $9,350.00 to the Spahns, and $25,500.00 to Steven Stegman, for an aggregate total of $64,800.00.

March 7, 2014. This amended petition requested permission to file a *nunc pro tunc* appeal to this Court. On March 19, 2014, the trial court reinstated Appellant's right to directly appeal his judgment of sentence *nunc pro tunc*. Thereafter, on April 14, 2014, Appellant timely filed the instant appeal.[6]

On appeal, Appellant raises the following issue for our review.

> I. [Whether the] Commonwealth failed to show that the Appellant engaged in deception in the sale of these lots[?]

Appellant's Brief at 5.

Appellant's issue raises a challenge to the sufficiency of the Commonwealth's evidence in support of his convictions. We begin by noting that "[t]he standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. O'Brien*, 939 A.2d 912, 913 (Pa. Super. 2007) (citation omitted). The determination of whether there is reasonable doubt is solely for the fact-finder and we will not disturb its finding unless the evidence is too weak and inconclusive to support any probability of fact. *Commonwealth v. West*, 937 A.2d 516, 523 (Pa. Super. 2007), *appeal denied,* 947 A.2d 737 (Pa. 2008). Moreover, "[t]he Commonwealth may

---

[6] Appellant and the trial court have complied with Pa.R.A.P. 1925.

sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." **Commonwealth v. Perez**, 931 A.2d 703, 707 (Pa. Super. 2007) (citations omitted). "[T]he trier of fact, in passing upon the credibility of the witnesses, is free to believe all, part, or none of the evidence." **Commonwealth v. Rivera**, 983 A.2d 1211, 1220 (Pa. 2009) (citation and internal quotation marks omitted), *cert. denied*, **Rivera v. Pennsylvania**, 560 U.S. 909 (2010).

Appellant argues that the Commonwealth presented insufficient evidence to show that he engaged in theft by deception, and securing execution of documents by deception.[7]   Appellant's Brief at 9-11. Specifically, Appellant contends there is insufficient evidence to prove the element of deception for the aforementioned charges.  Appellant's Brief at 12.  Appellant asserts that he did not deceive Kelly because the installation of a sewage system on Kelly's lots did not exceed $15,000.00, which was consistent with a term in the contract of sale with Kelly.  *Id.* at 9.  Further, Appellant argues that the Spahns did not need a sewage system because

---

[7] We note that in his concise statement, Appellant did not contest the sufficiency of the evidence for his conviction on count 5 for theft by failure to make required disposition of funds.  Therefore, we deem this issue waived on appeal, and we will not address it.  **See Commonwealth v. Garang**, 9 A.3d 237, 244 (Pa. Super. 2010) (concluding appellant must specifically assert which convictions he is challenging in his 1925(b) statement to preserve sufficiency of the evidence argument).

they did not intend to erect a permanent structure on the lot. *Id.* at 10. Moreover, Appellant contends that the Commonwealth did not prove that the purchasers sustained a pecuniary loss as a result of the allegedly deceptive practices. *Id.* at 10-11. Therefore, Appellant concludes, "there is insufficient evidence of record to convict the Appellant of attempting to deceive anyone regarding any of the lots." *Id*. at 12.

The trial court authored a comprehensive 14-page memorandum that properly disposes of each of Appellant's claims. The trial court found that there was ample evidence to sustain Appellant's convictions for theft by deception and securing execution of documents by deception. Trial Court Memorandum and Order, 4/11/13, at 5-11. The trial court conducted a thorough discussion of the deceptive conduct of Appellant regarding each count of each crime for which Appellant was convicted, concluding the evidence was sufficient to convict Appellant of each crime, except for one count of securing execution of documents by deception regarding the Stegmans.[8] *Id.*

---

[8] In its brief, the Commonwealth addresses the Appellant's claims solely as weight of the evidence claims. Commonwealth's Brief at 15. The Commonwealth contends that was the standard of review in both the trial court opinion and Appellant's 1925(b) statement. The Commonwealth claims Appellant's sufficiency of the evidence challenges are waived because said challenges are not raised in Appellant's brief to this Court. We disagree. Appellant's post-trial motion raised the sufficiency of the evidence issue, his 1925(b) statement preserved it, and the trial court memorandum addressed it. *See* Trial Court Memorandum and Order, 4/11/13, at 1 n.1 (noting,
*(Footnote Continued Next Page)*

The trial court concluded that the evidence was sufficient to sustain Appellant's convictions on the three counts of theft by deception. Regarding the Spahns, the trial court noted that even though the Spahns may not have initially needed sewage facilities, the evidence established the Spahns would not have purchased the lots if such facilities could not be added and Appellant assured them that the facilities could be added. *Id*. at 5. The trial court concluded that Appellant committed the crime of theft by deception beyond a reasonable doubt "[b]y (1) creating or at least reinforcing th[e] false impression [that the lots were amenable to an in-ground septic system] and (2) intentionally failing to correct it [despite the SEO informing Appellant the soils would not perk], thereby (3) obtaining $7,500 from the Spahns …." *Id*. Further, the trial court found Appellant committed theft by deception in the sale of lots to the Stegmans when Appellant "(1) created and (2) failed to correct the Stegmans' false impression tha[t] his improvements [of installing a spring water holding tank] would render their lots suitable for building a cabin, thereby (3) obtaining from them $30,000 at closing." *Id.* at 6. With respect to Kelly, the trial court observed

_(Footnote Continued)_ ———————————

"[t]he [post-trial] motion appears instead to be based upon insufficiency of the evidence."). Appellant raised the sufficiency of the evidence in his brief. Appellant's Brief at 2 (setting forth the scope of review and standard of review for insufficiency). Appellant also raised the weight of the evidence in his post-trial motions and 1925(b) statement, but has not challenged the weight of the evidence on appeal. Therefore, we address Appellant's claims as sufficiency of the evidence challenges.

Appellant's "intentional failure to correct Kelly's false impression that a septic system would be installed … [led] Kelly to pay him $8,200 and thereby satisf[ies] all the elements of theft by deception." *Id*. at 7.

The trial court also found the evidence was sufficient to support Appellant's conviction of two of the three counts of securing execution of documents by deception.[9] The trial court explained that Appellant obtained a total of $8,850.00 in checks from the Spahns by representing that a prefabricated cabin would be erected on their property and by representing that he would perform electrical service. *Id.* at 10. Appellant cashed the checks from the Spahns, but did not use the proceeds to hire a contractor to construct the cabin or to furnish electrical service. *Id.* Further, the trial court concluded "that the evidence demonstrated beyond a reasonable doubt that Kelly was deceived into paying $8,200.00 towards a septic system that was never installed." *Id.* at 11. Moreover, it is clear from the preceding discussion that Appellant's deceptive conduct directly caused a pecuniary loss to the three purchasers. Therefore, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the evidence was sufficient to sustain Appellant's convictions. *See O'Brien*, *supra*.

---

[9] As previously noted, the trial court granted Appellant's motion for judgment of acquittal on count 8 for securing the execution of documents by deception regarding the Stegmans.

We have reviewed the record in its entirety and have considered the merits of Appellant's claims. Following our careful scrutiny of the certified record, including the notes of testimony, the parties' briefs, and the applicable law, we conclude that the trial court's factual findings were supported by the record, and its legal conclusions were entirely proper. The well-reasoned opinion of the trial court provides a detailed analysis of the law of this Commonwealth as related to the facts of this case. The trial court then wholly refutes each of Appellant's arguments. Accordingly, we conclude that the April 11, 2013 memorandum and order of the Honorable John F. Spataro comprehensively discusses and properly disposes of Appellant's claims. Therefore, we adopt the trial court's opinion as our own for purposes of this appellate review, and affirm the April 11, 2013 judgment of sentence.[10]

Judgment of sentence affirmed.

---

[10] We note that Appellant's weight of the evidence claim and Appellant's reconsideration of sentences argument, addressed by the trial court on pages 11-14 of its opinion, were not pursued by Appellant on appeal. Therefore, we will not review those claims, and our disposition in this matter pertains solely to Appellant's challenges to the sufficiency of the evidence.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/8/2015

IN THE COURT OF COMMON PLEAS OF CRAWFORD COUNTY, PENNSYLVANIA

Criminal Division

| | | |
|---|---|---|
| Commonwealth of Pennsylvania | : | |
| | : | |
| VS. | : | No. CR 973 - 2011 |
| | : | |
| LLOYD ALONZO DECKER, Defendant | : | |

*Douglas W. Ferguson, Esq., Assistant District Attorney*
*Bruce A. Barrett, Esq., First Assistant Public Defender for Defendant*

## MEMORANDUM AND ORDER

John F. Spataro, J.

The Defendant, Lloyd Decker ("Decker"), is purportedly a developer who sold lots to David and Jennifer Spahn (the "Spahns") and to Steven and Deborah Stegman (the "Stegmans"), and contracted to sell lots to Thomas D. Kelly ("Kelly"). He was convicted following a bench trial of three counts of theft by deception, from the Spahns, Stegmans, and Kelly – felonies of the third degree, 18 Pa.C.S. § 3922(a)(3); one count of theft by failure to make required disposition of funds received, from Kelly – also a felony of the third degree, *id.* § 3927; and three counts of securing execution of documents by deception, from the Spahns, Stegmans, and Kelly – second degree misdemeanors, *id.* § 4114. Decker has moved post-sentencing for judgment of acquittal,[1] or in the alternative, for a new trial, and in addition, for reconsideration of his sentences. Upon review, we are convinced of the sufficiency of the evidence to support all but one of his criminal convictions. Of the count of securing execution of documents by deceiving the Stegmans, we acquit Decker and modify our Sentence Order accordingly. We also reduce the amount of

---

[1] We construe Decker's "Motion in Arrest of Judgment" as a motion for judgment of acquittal in conformity with the Comment to Pa.R.Crim.P. 606, which limits the former to "raising a challenge based on the court's jurisdiction, on double jeopardy, or on the statute of limitations." The motion appears instead to be based upon insufficiency of the evidence.

## EXHIBIT A

restitution awarded the Spahns. We otherwise dismiss his motion and request for reconsideration of his sentences for the reasons set forth in this Memorandum.

## Findings of Fact

**Spahns**: Responding to Decker's Internet advertisement for the sale of lots along French Creek in Crawford County, Mr. Spahn arranged to meet with Decker at the site in early 2010. They verbally agreed that Decker would have some trees removed, the land leveled, and a water well installed. Mr. Spahn was assured that electric service would be available and, while the Spahns initially did not need them, sewage facilities would not be a concern because of the property's remote location in East Fairfield Township. The purchase price was set at $15,000. Closing was held sometime between January 19 and February 1, 2010, prior to which some tree removal and grading had been done. A well was subsequently completed.

The local sewage enforcement officer (the "SEO"), after inspecting the Spahns' land on April 14, 2010, informed Decker that the soils would not pass a perk test, i.e., were unsuitable for any type of in-ground septic system eligible for a permit. Decker never disclosed the SEO's report to the Spahns, nor did he offer to rescind the purchase and sale transaction.

By check dated May 27, 2010, Decker was paid $1,850 for electric service, which was never provided. In the following months, Decker twice contacted Mr. Spahn and succeeded in interesting him in the purchase of a pre-fabricated log cabin to be built on the purchased lots. They met on August 5, 2010, and Decker was paid $500 cash and $3,000 by check, with the balance of the $7,500 purchase price paid by check dated August 13, 2010. All checks were immediately cashed. Decker verbally contracted with Benjamin Byler ("Byler") for the installation of the cabin. No building permit was ever sought, for which a sewage permit would have been a prerequisite.

Byler substantially completed the portable cabin, though at a height Decker had specified of about thirty inches above ground in violation of zoning regulations; a minimum of eight and a half feet was required because the property lay in a flood zone. When the only payments Byler received from Decker were two checks, both of which bounced, he removed the cabin. The Spahns were never refunded any of the money they paid Decker for either the cabin or electric service, and their telephone calls to him went unreturned.

**Stegmans**: Also responding to Decker's Internet advertisements, Mr. Stegman met with him on April 14, 2010 and discussed plans to build a cabin on lots adjoining the Spahn property. They executed a sales agreement ten days later, setting the purchase price at $30,000 and appending a list of improvements consisting of tree removal, leveling, planting grass, and adding driveways and utilities, with completion being "weather dependent." The specified utilities included "$H_2O$, electric, and spring water holding tank (1000 gal)." Closing was held on May 15, 2010, and prior or subsequent thereto the property was leveled, grass planted, identified trees cut down, graveled driveway added, and a sixty foot well dug.

Electrical service was never established, nor was a permitted sewage system ever installed. Decker knew from the SEO's April 14, 2010 report, which had evaluated the Stegman as well as the Spahn lots, that an in-ground sewage system was impermissible. He nevertheless later informed Mr. Stegman that a stake indicated the location of the spring water holding tank, without disclosing that such a tank did not constitute an allowable septic system.[2]

**Kelly**: After also viewing an Internet advertisement posted by Decker, Mr. Kelly met with him on May 6, 2010 to evaluate the offered real estate along French Creek as a site for a weekend getaway cottage. Decker suggested a fresh water holding tank as an adequate sewer

---

[2] There is considerable doubt as whether any tank had been installed.

system, which Kelly refused. They that day signed an Agreement of Sale expressly contingent upon approval for a sewer system costing no more than fifteen thousand dollars.[3]

The property was owned by W. L. Dunn Construction Company ("W. L. Dunn"), from whom Decker represented that he would receive, as developer, thirty percent of the $61,500 purchase price. He verbally agreed to construct a road, clear land for the dwelling, drill a well, bring in electricity, and install a septic system. Kelly made a down payment of $6,200, and between May 29 and October 11, 2010, paid Decker an additional $23,750, with Decker signing receipts for $8,200 that referenced a septic survey and septic materials.

No sewage permit was ever issued, although soils there were determined to be suitable for an in-ground septic system. The only development that occurred on the property was some clearing and bulldozing for a roadway. W. L. Dunn received none of the sums paid by Kelly, and Kelly received neither a deed to the property nor any refund. Decker avoided all of Kelly's later attempts to contact him.

## Motion for Judgment of Acquittal

### Theft by Deception

Theft by deception is defined as intentionally obtaining property of another by deception. 18 Pa.C.S.A. § 3922. Deception occurs upon failure to correct a false impression that one previously created or reinforced. 18 Pa.C.S.A. § 3922(a)(3). The essential components of the offense charged are thus: (1) creating or reinforcing a false impression; (2) intentionally failing to correct that impression; and (3) thereby obtaining property of another. *See Commonwealth v. Fisher*, 682 A.2d 811, 813-14 (Pa. Super. Ct.), *appeal denied*, 546 Pa. 691 (1996).

---

[3] It is unclear who was intended to benefit by the dollar limitation.

**Count 2 (Spahns):** The Spahns did not need sewage facilities at the time of purchase, as they planned initially to park a camper on their lots. The $15,000 purchase price had been a considerable expenditure for them, and they had no immediate plans to develop the property. Mr. Spahn testified, however, that he would not have purchased the lots if such facilities could not be added, and that Decker had assured him that "in Crawford County up here we're so far out, don't really care what you do." Trial Tr. at 40-42, 50.[4]

Mr. Spahn's false impression as to the availability a standard septic system was reinforced by Decker coaxing him into purchasing a prefabricated cabin. Decker wanted to have the cabin built, despite having been informed by the SEO that the soils there would not perk, so as to lure other buyers and yield him a considerable profit.[5] Trial Tr. at 33, 135. These plans supply the necessary element of intent in his failure to correct the Spahns' false impression that their property was amenable to an in-ground septic system, servicing a lawfully permitted cabin. By (1) creating or at least reinforcing that false impression and (2) intentionally failing to correct it, thereby (3) obtaining $7,500 from the Spahns, Decker committed the crime of theft by deception beyond any reasonable doubt.[6]

Decker maintains that the Spahns were not misled because their lots were suitable for a small flow sewage treatment facility. Such a system, which the SEO indicated was only a possibility, necessitates an application process with the Department of Environmental Protection, substantial engineering, and ongoing monitoring and maintenance well beyond an in-ground

---

[4] Decker claimed to have told Mr. Spahn that "the septic system, the only way that it could be approved is a stream system discharge." Trial Tr. at 113. The Court believes his testimony to be less credible that Mr. Spahn's account.

[5] Decker placed full responsibility on Byler for constructing the $7,500 cabin, including obtaining a building permit, while agreeing to pay him only $3,300. Trial Tr. at 108, 112, 128, 133, 135, 137-39.

[6] While Decker asserts that the cabin's removal gives rise to only a civil matter, his deception thrusts him into the criminal arena.

septic system. The SEO placed the initial cost at between $16,000 and $24,000. Trial Tr. at 15-18. This clearly was not an expense Mr. Spahn anticipated.

**Count 3 (Stegmans):** Mr. Stegman communicated his building plans, and consequent need for the installation of a septic system, when he first met with Decker on April 14, 2010. Decker reportedly replied "that he would put in the spring water holding tank and that was okay." Stegman Trial Tr. at 8. He knew or should have known, as a developer, that any building permit would be conditioned upon an acceptable sewer system. Informed by the SEO that no in-ground septic system could be permitted on the Stegman lots, he nevertheless proceeded to close, and later represented that such a system had been installed as one of the agreed upon improvements.

Decker thus both (1) created and (2) failed to correct the Stegmans' false impression than his improvements would render their lots suitable for building a cabin, thereby (3) obtaining from them $30,000 at closing. His intent to create that impression and to conceal its falsity are amply demonstrated by his informing the Stegmans that a stake indicated the location of the system he supposedly had installed.[7] Stegman Trial Tr. at 8-9; Trial Tr. at 136; *cf. Fisher*, 682 A.2d at 814-15 (Fisher's failure to correct his misrepresentation to clients wanting to build, that the lands he offered for sale were perkable, established the intent element of theft by deception).

Decker argues that the Stegmans also could have had a small flow sewage treatment facility installed, at their cost, and that he was bound only by a purchase and sale agreement that did not reference a sewer system. Their agreement, on the contrary, stipulates the installation of "utilities," including what Decker characterized as a spring water holding tank. Com.'s Ex. 3;

---

[7] Decker's Motion focuses upon the failure of the Stegmans, as well as the Spahns, to make inquiries of anyone else as to the cost or feasibility of a septic system. We decline to shift this burden from a criminal defendant charged with deceit who represented himself as a developer.

Stegman Trial Tr. at 7. "Spring water holding tank" was apparently a phrase he concocted to hide his deception, which only further validates his conviction.[8]

**Count 1 (Kelly):** Mr. Kelly was led to believe falsely that the property he had contracted to purchase would be developed, and then deeded to him for the construction of a vacation cottage. Decker never paid for a septic survey, nor applied for a permit, but nevertheless signed receipts referencing septic system materials and survey. He told Kelly that "we're ready to go and get this done," and blamed delays on "[t]he sewage inspector being sick and the paperwork being at the EPA." Trial Tr. at 74-75, 79-80. His intentional failure to correct Kelly's false impression that a septic system would be installed – an impression nourished by the receipts and excuses – lead Kelly to pay him $8,200 and thereby satisfy all the elements of theft by deception.

### Failure to Make Required Disposition of Funds Received

The offense of failure to make required disposition of funds received is defined as follows:

> A person who obtains property upon agreement, or subject to a known legal obligation, to make specified payments or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained as his own and fails to make the required payment or disposition....

18 Pa.C.S.A. § 3927(a). The four elements of the crime are thus: (1) obtaining property of another (2) subject to an agreement or known legal obligation to make specified payment or other disposition thereof, (3) intentionally dealing with such property as one's own, and (4) failing to make the required payment or disposition. *Commonwealth v. Crafton*, 337 A.2d 1092, 1094-95 (Pa. Super. Ct. 1976), *corrected*, 599 A.2d 1353 (1991).

**Count 5 (Kelly):** Decker had arranged with W. L. Dunn to receive thirty percent of the proceeds for developing and selling the lots that were offered for sale to Mr. Kelly. Trial Tr. at

---

[8] Mr. Stegman's testimony was more credible than anything offered by Decker to explain this play on words.

84, 89, 115. He received $29,950 from Kelly in partial payment of the $61,500 purchase price, and paid nothing to W. L. Dunn. Trial Tr. at 86-90, 122. Obtaining funds from Kelly and failing to remit them to W. L. Dunn pursuant to their agreement satisfies all but the felonious intent element of the offense of failure to make required disposition of funds received.

Decker displayed an utter disregard for his principal, W. L. Dunn, in handling Kelly's initial deposit and later payments: "as long as I had my 30 percent – or that I received my 30 percent, he [Kelly] could close at any time with Dunn." Trial Tr. at 140. W. L. Dunn anticipated receipt of 100 percent of the sale proceeds, from which Decker would be paid thirty percent, or $18,450. Trial Tr. at 89, 95. Allowing, instead, for the deduction of this fee from Kelly's partial payments still leaves Decker with $11,500 in excess funds belonging to W. L. Dunn. Decker appears to maintain that this excess was the additional cost for installing a septic system and well, but Kelly credibly testified that both improvements were included in the purchase price.[9] The excess, in any event, was not expended on a required septic survey, permit, or well.[10]

When Decker offered only excuses for his failure to perform, and later could not be reached, Kelly's attorney contacted Jerry Dunn ("Dunn") of the W. L. Dunn company. Unable to reach Decker by phone, Dunn found where he lived, called upon him personally, and arranged to meet with him the next day at his office. Decker never appeared, and Dunn abandoned what he considered to be wasteful efforts to contact him. Trial Tr. at 87-89. Decker's own testimony,

---

[9] The Commonwealth placed in evidence a development agreement between the parties dated June 6, 2010 that includes "updating well, septic and any other utilities." Com.'s Ex. 8. That document was patently designed to detail arrangements between a developer and seller of real estate, rather than a purchaser, and places development "[a]t Developer's discretion." Its illusory nature substantiates Decker's deception if not Kelly's understanding.

[10] Asked whether the surveyor had been paid, Decker replied no, because "[t]hat job was never completed." Trial Tr. at 132. In light of his failure to pay Byham for the Spahns' cabin, we decline to infer from his testimony that he intended to pay the surveyor (or anyone else) upon completion of work.

his avoidance of Kelly and Dunn, and his retention of Kelly's payments establish his intent to deal with the sale proceeds as his own.[11]

Decker is mistaken that his conviction of two theft crimes (Counts 1 and 5) was erroneous because both involve "exactly the same money," as Count 1 is grounded solely upon that portion of the $29,950 that Kelly paid him towards a septic system ($8,200). Even if accurate, his contention is unsupported in the case law. *E.g., Commonwealth v. Favinger*, 516 A.2d 1386, 1388 (Pa. Super. Ct. 1986) (affirming bookkeeper's conviction of both offenses on the basis of the same missing checks). Neither offense, moreover, is a lesser included offense of the other, as required for merger; they involve different acts and different mental states. *See, e.g., Commonwealth v. Evans*, 901 A.2d 528, 536-37, 2006 PA Super 132. Count 1 is based upon Decker deceiving Kelly into paying $8,200 for a non-existent sewer system,[12] whereas Count 5 is predicated upon Decker's abrogation of duty to pay W. L. Dunn. Decker intentionally deprived Kelly of money (Count 1), and in addition, intentionally used W. L. Dunn's money as his own (Count 5).[13]

### Securing Execution of Documents by Deception

A person commits the offense of securing execution of documents by deception "if by deception he causes another to execute any instrument affecting or purporting to affect or likely to affect the pecuniary interest of any person." 18 Pa.C.S.A. § 4114. Decker was charged with

---

[11] The Commonwealth was not required to offer testimony as to how Decker actually used those payments as his own. *Commonwealth v. Fritz*, 470 A.2d 1363, 1357 (Pa. Super. Ct. 1983) (dictum); *see Crafton, supra.*

[12] According to the SEO, Kelly's system would have cost only $6,000. Trial Tr. at 18.

[13] Decker's argument might be applicable in regard to the Spahns, from whom he was also charged with theft by deception (Count 2) as well as theft by failure to make required distribution of funds received (Count 4): The later Count was based upon Decker's failure, as intermediary, to pay Byler any of the $7,500 that the Spahns paid him for the cabin – the same $7,500 that formed the basis of his conviction on Count 1 (*supra*). We need not consider the merits of his argument, however, because Decker was acquitted of Count 4.

obtaining check payments by deception from the Spahns and the Stegmans, and obtaining contracts as well as check payments from Kelly by deception.

**Count 7 (Spahns)**: Relying upon Decker's representations that a prefabricated cabin would be built on their property, the Spahns had two drafts totaling $7,000 drawn on their credit union account made payable to him. (Com.'s Ex. 5). Decker cashed both checks, but never paid Byler to construct the cabin. His explanation of having an agreement to offset the price with bail money he had posted for Byler is belied by the two worthless checks he issued, and contradicted by Byler's more credible testimony. Trial Tr. at 28-29, 33-34, 108-9, 134-35. Decker pocketed the Spahn's money on the rationale that Byler "would get future business for the construction of [additional] cabins," with the Spahn's cabin serving as a model. Trial Tr at 33, 135. He solicited the purchase but denied responsibility for either obtaining a permit or finishing the cabin. His declaration that the Spahns "did have a cabin" highlights his duplicity. Trial Tr. at 133, 138. No cabin exists on the property, nor was a building permit obtained for one. The Spahns were not refunded any of the $7,500 purchase price. We conclude that Decker never intended to pay Byler any part of the purchase price, and that the Spahns were thus intentionally deceived into paying Decker with their two credit union checks.

Their third check, for $1,850, also made payable to Decker, "was for the electrical service that was never provided." Trial Tr. at 44. Decker merely placed a temporary box on an adjacent property. Trial Tr. at 104. The inference that he never intended to fully perform is confirmed by his failure to furnish electric service (or sewer systems) for the Stegmans and Mr. Kelly as well. The execution of the Spahns' third check was, therefore, also obtained by deception.

Decker asserts that his conviction on Count 7 should be set aside because the Spahns were deeded their lots pursuant to the sales agreement, and any failure to abide by that agreement

is a civil matter. His Count 7 conviction, however, rests upon execution of checks for the cabin rather than the sales agreement.

**Count 8 (Stegmans):** An essential element of the crime of securing execution of documents by deception is an "instrument" affecting a pecuniary interest – in this case, a check. Although we have concluded that the Stegmans were deceived into paying Decker $30,000 for their property (see Count 1), the Commonwealth did not present evidence of any check or checks having been executed in payment of the purchase price. Decker's judgment of sentence on Count 8 must therefore be vacated upon reconsideration.

**Count 6 (Kelly):** In our discussion of Count 3, we determined that the evidence demonstrated beyond a reasonable doubt that Kelly was deceived into paying $8,200 towards a septic system that was never installed. Payment was via three checks which Decker cashed and for which he signed receipts (Com.'s Exs. 9 & 10). Obtaining, by deception, $8,200 in check payments from Kelly satisfies each of the elements of the crime of securing execution of documents (checks) by deception.

Decker denies any fraud or deception because he disclosed his principal, W. L. Dunn. As his conviction is based upon the septic system payments, we need not determine whether the Commonwealth established fraud in the execution of the Kelly sales agreement.

## Motion for New Trial

In moving for a new trial, Decker evidently contends that the verdict was contrary to the weight of the evidence.[14] For a new trial to be awarded, the verdict must be so contrary to the evidence as to "shock one's sense of justice." *Rivera, supra* n.13. The evidence, on the contrary,

---

[14] Mr. Decker has not specifically alleged that the weight of the evidence does not support his convictions. We nevertheless address the motion as going to the weight of the evidence, recognizing that a motion for a new trial must concede its sufficiency, for otherwise the defendant would be placed in double jeopardy. *Commonwealth v. Rivera,* 983 A.2d 1211, 1225 (Pa. 2009); *Commonwealth v. Whiteman,* 485 A.2d 459, 462 (Pa. Super. Ct. 1984).

suggests that Decker's modus operandi was to do just enough site preparation to create the illusion that he was proceeding with substantive lot improvements. Quite apart from the diminution in value of their lots because the soils there will not perk, the Spahns did not get a cabin, and the Stegmans did not get utilities for which they paid. Kelly received nothing at all. We discern no facts suggesting that justice was denied, rather than served. *See Rivera*, 983 A.2d at 1225-26.

### Reconsideration of Sentences

The provisions of 42 Pa.C.S.A. § 9721(b) guide us in reconsidering the sentences imposed on Decker:

> The court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant. The court shall also consider any guidelines for sentencing adopted by the Pennsylvania Commission on Sentencing and taking effect pursuant to section 2155 (relating to publication of guidelines for sentencing).

We review again the pre-sentencing report (showing *inter alia* convictions in 2008 for criminal mischief and in 2009 for receiving stolen property), and we also take into account such factors as the nature of his crimes, his character, and his demeanor at trial and apparent lack of remorse. *See generally Commonwealth v. Ellis*, 700 A.2d 948, 958 (Pa. Super. Ct. 1997).

On Counts 1, 2, and 3 of theft by deception, with an offense gravity score of four[15] and having a prior record score of two, Decker was sentenced to incarceration for a minimum term of twelve months, well within the standard range sentence of three to fourteen months established by the guidelines. His sentence of incarceration for a minimum of twelve months on Count 5 is

---

[15] With respect to Counts 1 and 3, thefts exceeding $25,000.00, the sentencing guideline form included with the pre-sentencing report erroneously indicated an offense gravity score of four instead of six, for which the standard range sentence on a prior record score of two is a minimum of nine to sixteen months, rather than three to fourteen months. Decker's minimum sentence of twelve months was therefore at only the median level for those two actual offenses.

also within the standard range of three to fourteen months for failure to make required disposition of funds received.[16] Decker also received a standard range sentence of three months incarceration on each of his convictions on Counts 6, 7, and 8 of securing execution of documents by deception.[17]

These sentences in accordance with the guidelines recognize the gravity of his offenses and the impact on his multiple victims and, it is hoped, present an opportunity for rehabilitative treatment. *Cf. Commonwealth v. Lilley*, 978 A.2d 995 (Pa. Super. Ct. 2009). Decker also has impacted the reputation of the community by swindling three out-of-county residents, further influencing our determination that his sentences for deception should run consecutive rather than concurrent and towards the higher end of the standard range.

Decker concedes that the Spahns are entitled to be reimbursed $8,850 for the cabin,[18] and that $29,950 is appropriate restitution for Kelly. The additional $10,500 ordered in restitution to the Spahns and $25,500 to the Stegmans represents the differences between the purchases prices for their properties and their appraised value of $4,500. Decker admits in his supporting memorandum of law that "[the Stegmans' land] is apparently worth less than the amount [they] agreed to pay," but asserts that restitution should not be based upon an appraisal because their agreement with Decker was an arms length transaction. Reduction in value is, we believe, the proper measure of damages for a transaction founded on deceit, and an appropriate remedy in this criminal proceeding. *Cf.* 18 Pa.C.S. § 1106(c)(1)(i) ("The court shall order full restitution ... so as to provide the victim with the fullest compensation for the loss.").

---

[16] The offense gravity score on Count 5 should also have been six (see n.15, *supra*), rather than four as reported, for which the standard range sentence is likewise a minimum of nine to sixteen months on a prior record score of two. Decker again benefited from this miscalculation.

[17] As indicated above, his Count 8 sentence will be nullified.

[18] Both this figure, from Decker's supporting Memorandum of Law, and the Court's award of $19,350 overlook the $500 down payment that Mr. Spahn paid Decker in cash for the cabin. Trial Tr. at 44.

We are constrained, however, to agree with Decker that the amount of restitution awarded the Spahns should be reduced from $19,350 to the $9,350 they paid him for a cabin and electrical service. While the Spahns may have purchased their lots on the false assumption, reinforced by Decker, that an in-ground septic system could be added later, it was not shown that Decker knew of the falsity of that assumption until delivery of the SEO's report months later. There is thus no evidence that he knowingly failed to correct a false impression at the time he obtained the $15,000 purchase price, or that he caused the Spahns to execute check payments at closing by deception.

Decker's convictions on Counts 2 and 7 remain because they pertain to the cabin and electricity, for which restitution is properly ordered. The additional restitution, based upon the difference between the purchase price for the Spahns' property and its fair market value (without septic suitability), cannot, however, be sustained.

Accordingly, we enter the following **ORDER**:

## ORDER

AND NOW, this **11**[th] day of **April 2013**, for the reasons set forth in the foregoing Memorandum, the following is ORDERED:

1) Defendant's judgment of conviction of Count 8, Securing Execution of Documents by Deception, with respect to Steven Stegman, is vacated.

2) The Additional Sentence of the Court Order dated the 10th day of December, 2012 is modified to read as follows:

**Upon** a conviction for Securing Execution of Documents by Deception, Counts 6 and 7, each misdemeanors of the second degree, the sentence of the Court is as follows:

- Pay a fine of $ **200.00** for each count, bringing the aggregated total to $ **400.00**.

- Serve a period of **Incarceration in a State Correctional Institution** to be determined by the Department of Corrections for a minimum term of   3   months to a maximum term of

24 months, for each of Counts 6 and 7, totally concurrent with the sentence imposed above for the conviction at Count 5, but consecutive to the sentences at Counts 1, 2 and 3 with pre-sentence incarceration credit of     0     days.

3) The Additional Terms of Sentence of the Court Order is modified to read as follows:

■ Pay restitution to **Thomas Kelly** in the amount of **$ 29,950.00**; to **David and Jennifer Spahn** in the amount of **$ 9,350.00** and to **Steven Stegman** in the amount of **$ 25,500.00** All payments made shall first apply toward restitution before being applied to costs, fines and fees.

4) The Sentence Summary of the Court Order is accordingly modified to read as follows:

■ The foregoing represents a state sentence of incarceration aggregated to **48 to 96 months, with 118 days of credit.** The Defendant is **RRRI** eligible, having an **RRRI minmum of 40 months.** The aggregated total **fine is $ 2,400.00.** The total restitution is **$ 64,350.00.**

5) Defendant's Post-Sentence Motion is in all other respects denied.

6) The Defendant is advised that he has a right to file an appeal to the Superior Court. Any such appeal must be filed within thirty (30) days from this date or these matters become final.

7) The Defendant has the right to assistance of counsel in the preparation of an appeal if he chooses to engage in his right to appeal. If Defendant cannot afford counsel of his own, he has the right to appeal *in forma pauperis* and counsel will be appointed for purpose of the appeal.


BY THE COURT,


(Signed: John F. Spataro, J.)
Judge